UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------ X
JOSEPH P. LASALA and                         :
FRED S. ZEIDMAN, as CO-TRUSTEES of
the AREMISSOFT CORPORATION        :
LIQUIDATING TRUST,

:        06 Civ. 6673 (CSH)

Plaintiff,

:        MEMORANDUM OPINION
                                                           AND ORDER

-against-

:

BANK OF CYPRUS PUBLIC
COMPANY LIMITED

:

Defendant.
------------------------------------------------ X
HAIGHT, Senior United States District Judge:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08-15-07

In this diversity action, plaintiffs seek to hold defendant Bank of Cyprus Public Company

Limited ("Bank of Cyprus" or "the Bank") responsible for its alleged role in connection with a

massive "pump and dump" scheme perpetrated by two corporate insiders of a software company,

who fraudulently inflated the company's value and then sold their shares and funneled these funds

through banks in Cyprus and elsewhere. In this motion defendant seeks to dismiss the complaint on

three separate grounds: (1) *forum non conveniens*; (2) preemption of the claims by the Securities

Litigation Uniform Standards Act, 15 U.S.C. §§ 77, 78 ("SLUSA"); and (3) failure to state a claim

upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons,

I dismiss the complaint on the ground of *forum non conveniens*.

## I.  BACKGROUND

### A.    The Scheme Perpetrated by Kyprianou and Poyiadjis

Much of the following account is drawn from the Amended Complaint (the "complaint"),

1

whose well-pleaded factual allegations are taken as true on this motion. AremisSoft Corporation ("AremisSoft" or "the Company") was a software company, incorporated in Delaware, whose main business was development and sale of computer software technology. Compl.¶ 9. From about 1998 through July of 2001, Lycourgos Kyprianou and Roys Poyiadjis, two officers of the Company,[1] caused the Company to issue false public statements and regulatory filings representing to the public that it was experiencing rapid growth when in fact its growth nowhere neared the stated revenues. *Id.* ¶ 20. The two men caused AremisSoft to announce publicly that it had acquired other software companies of significant value, when, in reality, the companies were small and had been acquired for much less than the announced price. They fabricated records in support of these falsehoods. *Id.*

The effect of these fraudulent misrepresentations was that the value and profitability of the Company were perceived to be much greater than they actually were, and consequently the price at which the Company's shares were traded on the open market was artificially high. Kyprianou and Poyiadjis sold their shares at these inflated prices to investors who were not privy to their knowledge concerning the true value of the Company. Kyprianou also looted money directly from AremisSoft by converting tens of millions of dollars from AremisSoft to his own accounts. *Id.* ¶ 4.

By May 2001 attention began to be focused on AremisSoft for reporting inflated income. On May 17, the *New York Times* reported that the true value of an AremisSoft contract with the Bulgarian government was not the $37.5 million claimed by the Company but rather less than $4 million. *Id.* ¶ 24. By May 24, 2001, at least one class action lawsuit against AremisSoft and its

---

[1] Kyprianou was AremisSoft's founder and served as Chairman of the Board of Directors from October 1997, and served as co-CEO with Poyiadjis from February 2001 to July 31, 2001. Poyiadjis served as a director and Chief Financial Officer until September 1999, the company's President until January 2001, and Co-CEO from February 2001. Compl. ¶ 9.

2

directors had been filed. *Id.* On July 31, 2001, the day after AremisSoft was due to release its second quarter 2001 earnings, the Company announced that Kyprianou had resigned and that it was delaying the earnings release. On July 31, 2001, the Company was delisted from NASDAQ. *Id.* On or about October 4, 2001, the SEC sued Kyprianou and Poyiadijs in a civil injunction action, alleging that they had sold millions of shares of their AremisSoft stock in violation of U.S. securities laws. *Id.* ¶ 25. In an action before this Court, the SEC succeeded in freezing $175 million of Poyiadjis's proceeds lodged in bank accounts in the Isle of Man. In December 2001, an indictment was obtained against Poyiadjis in the Southern District of New York, and in June 2002, a superseding indictment was returned against Kyprianou, Poyiadjis, and M.C. Mathews, the top AremisSoft executive in India, on counts of securities fraud and money laundering, and conspiracy to commit both crimes. *Id.* ¶¶ 26, 29. On March 15, 2002, AremisSoft filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. *Id.* ¶ 27.

## B.   **The Parties**

Neither the swindlers or any of their co-conspirators, whose acts of fraud and theft are undisputed, are parties to this case. Kyprianou is in Cyprus, and Poyiadjis is awaiting sentencing in this Court, having pleaded guilty to fraud. *See United States v. Poyiadjis et al.*, 01 Cr. 1177, 2002 WL 1941481 (S.D.N.Y. Aug. 21, 2002). Defendant is a banking corporation with its principal place of business in Nicosia, Cyprus. Decl. Louis Pochanis in Supp. Def.'s Mot. Dismiss, dated Nov. 30, 2006 ("Pochanis Decl."), at ¶¶ 1, 4. The Bank operates 146 branches in Cyprus and is the leading financial services organization in Cyprus, with a market share in total banking system deposits and loans in Cyprus of over 25%. *Id.* ¶ 4. The Bank also operates more than 240 branches worldwide and maintains correspondent relationships with more than 2300 banks, which allow the Bank to

3

engage in transactions in United States currency. *See* Compl. ¶¶ 12, 14. The Bank maintains a representative office in New York. *Id.* ¶ 11.

AremisSoft was a depositor of the Bank of Cyprus. Plaintiffs are co-trustees of the AremisSoft Corporation Liquidating Trust (the "Trust"), a Delaware trust formed pursuant to three orders by District Judge Pisano of the District of New Jersey in connection with AremisSoft's voluntary bankruptcy: (1) a July 2002 order confirming the First Amended Joint Plan of Reorganization of AremisSoft ("Plan of Reorganization"); (2) an August 2002 order approving a Class Action Settlement with AremisSoft; and (3) an August 2002 order correcting the Order and Final Judgment previously entered in respect of AremisSoft's Chapter 11 bankruptcy petition. *Id.* ¶ 5. The governing documents for the Trust are the Plan of Reorganization and the Liquidating Trust Agreement ("Trust Agreement").

This action seeks to pursue some of the claims assigned to the Trust. The Trust was assigned four categories of assets: (1) AremisSoft's pre-confirmation causes of action; (2) causes of action arising under the Bankruptcy Code; (3) proceed assets irrevocably transferred to the Trust pursuant to the Plan; and (4) investor claims. Pl.'s Mem. in Opp'n, at 4. The Trust beneficiaries are Softbrands, Inc., the successor corporation into which all the viable operating assets of AremisSoft were vested, and the former AremisSoft investors. *Id.* at 14. Plaintiffs state in their brief that "[w]hile the Trust is authorized to pursue litigation on behalf of its beneficiaries, including Softbrands – which, notably, is not a former investor but the corporate successor of AremisSoft – it also engages in other non-litigation activities consonant with those of any other post-confirmation trust. These activities include the collection of assets, liquidation of those assets, investment of the liquid assets, and distribution of the net proceeds to the Trust beneficiaries." *Id.*

4

## C.   The Allegations Against the Bank

This case, along with the related cases filed by the plaintiff Trustees against UBS, AG ("UBS") and Lloyds TBS Bank, PLC ("Lloyds"),[2] turns on the role of a bank in facilitating the fraud and/or the money laundering of one or both of the swindlers and their co-conspirators. In the captioned case against the Bank of Cyprus, Kyprianou is the central villain. The gravamen of the complaint is that "Defendant, knowingly and in breach of its duties and obligations to AremisSoft Corporation ('AremisSoft' or the 'Company') as its depositor, allowed AremisSoft's former Chairman and CEO Lycourgos Kyprianou ('Kyprianou') to loot Company assets for Kyprianou's personal gain and benefit and to launder through bank accounts at Bank of Cyprus millions of dollars in proceeds of the massive, international fraud Kyprianou and his co-conspirators perpetrated on AremisSoft." Compl. ¶ 2.

The Bank of Cyprus administered at least eight accounts in the name of AremisSoft, as well as numerous accounts for AremisSoft affiliates and other alter ego companies controlled or owned by Kyprianou. Pl.'s Mem. in Opp'n, at 5; Compl. ¶¶ 3, 33-34. The Bank also extended a loan, secured by AremisSoft stock, to one of Kyprianou's alter ego companies. *Id.* ¶¶ 3, 41. The accounts in question were, in plaintiffs' words, "funded" by AremisSoft's accounts at Commerce Bank in New Jersey, and transactions in and out of them were facilitated by correspondent banks in New

---

[2] Pursuant to Local Civil Rule 1.6 governing the procedure for an attorney's request that a case be accepted as related to a case pending before a particular judge, this Court has accepted *LaSala & Zeidman v. Lloyds TSB, PLC*, 06 Civ. 4335 (CSH), and *LaSala & Zeidman v. UBS AG*, 06 Civ. 1736 (CSH) as related to the case at bar. All defendants in all three cases have moved on similar grounds to dismiss the complaints. The Court's opinions deciding these three motions are being filed concurrently.

York. Pl.'s Mem. in Opp'n, at 5. Kyprianou and his wife also maintained numerous personal

accounts at the Bank. Compl. ¶ 36.

The complaint details a number of transactions in which Kyprianou moved funds from

AremisSoft accounts into accounts of alter ego companies for which he was the beneficial owner

and/or into personal accounts. The following are particular transactions cited by plaintiffs:

o Kyprianou was the beneficial owner of the accounts of Southwood Management Ltd ("Southwood"), an alter ego entity. In 2000, the Southwood accounts at Bank of Cyprus received large deposits that were the proceeds of sales of AremisSoft stock, money which was then transferred to an account at HSBC in London jointly owned by Kyprianou and his wife. Kyprianou also transferred close to $12 million of AremisSoft's corporate cash to Southwood's bank accounts at Bank of Cyprus. Compl. ¶¶ 37, 38, 63; Pl.'s Mem. in Opp'n, at 5.

o Kyprianou controlled at least three bank accounts at Bank of Cyprus in the name of another alter ego entity called Semark Consultancy Services ("Semark"). In 2001, Kyprianou transferred more than $10 million of AremisSoft's corporate cash to these accounts at the Bank of Cyprus. Then he transferred approximately $2.5 million from a Semark account to a personal account held by him and his wife at HSBC in London. Compl. ¶¶ 39, 67-68; Pl.'s Mem. in Opp'n, at 6.

o In December 2000, Kyprianou caused $10.9 million to be transferred from one of AremisSoft's Bank of Cyprus accounts to an account in the name of Still & Life, an Austrian company whose accounts at Bank of Cyprus he controlled, "purportedly for the purchase of an India-based software company known as E-ChaRM." Pl.'s Mem. in Opp'n, at 6. Kyprianou had, however, already purchased the company for only $290,000. Compl. ¶ 49. That same day, Kyprianou instructed the Bank to transfer nearly all the money from the Still & Life account to one of the Semark accounts, for which he had signing authority. *See* Pl.'s Mem. in Opp'n, at 6-7; Compl. ¶¶ 42-44, 51.

o In December 2000, Kyprianou also caused $7.34 million to be transferred from one of AremisSoft's Bank of Cyprus accounts to an account in the name of Denon at Bank of Cyprus, "purportedly for purchase of a Dubai-based software company." Pl.'s Mem. in Opp'n, at 7. Kyprianou had, however, already acquired the company for only $250,000. Compl. ¶ 54. That same day, approximately $7.4 million was transferred from the Denon account to a Southwood Bank of Cyprus account. *See id.* ¶¶ 54-57.

6

o Even after HSBC terminated its relations with the Kyprianous, the UK branch of the Bank of Cyprus welcomed the Kyprianous and opened accounts in August 2001 for the funds formerly at HSBC. This was three months after media reports appeared concerning the AremisSoft fraud. *Id.* ¶ 72.

o On or about April 9, 2002, Kyprianou transferred £645,534.51 from an account he held at Lloyds TSB Bank in Geneva, Switzerland into one of Mrs. Kyprianou's accounts at Bank of Cyprus. This Lloyds TSB account had allegedly been used by Kyprianou to launder more than $44 million worth of his illegal insider trading proceeds of AremisSoft stock. *Id.* ¶ 82. That same day, the same amount of money was moved into another Bank of Cyprus account maintained by Mrs. Kyprianou, and the next day it was transferred to yet another account. *Id.* ¶ 83.

These transactions fall into three categories. In the first, Kyprianou simply looted AremisSoft funds by moving corporate cash into accounts of alter ego companies he controlled. In the second, Kyprianou ferreted away in his own accounts the spread between the amount he told the AremisSoft board he was paying for the companies being acquired and the much lower amount that he actually paid for them. In the third, Kyprianou laundered the proceeds of his illegal insider trading.

Allegedly Bank of Cyprus employees in London voiced concerns in their internal documents about the irregularity of the above transactions in October of 2001. *Id.* ¶¶ 75-92. Yet, with only minor restrictions, the Bank of Cyprus management did not alter its permissive administration of the accounts. *See id.* ¶¶ 81, 93. The Bank allegedly serviced the accounts and facilitated transfers for approximately three more years. *Id.* ¶ 80.

Plaintiffs' allegations against the Bank can be summarized by two paragraphs in the complaint:

> For a period of approximately three years, Bank of Cyprus knowingly allowed Kyprianou, and those acting on his behalf, to use its accounts to launder money in furtherance of his fraudulent scheme until the accounts, including the Semark and Southwood accounts, were virtually emptied out in 2004 and 2005.
>
> The numerous transfers made by the Kyprianous through their accounts at Bank of Cyprus bore all the classic hallmarks of money laundering. The activity in the accounts were [sic] especially suspicious in light of the numerous public allegations

7

of fraud against Kyprianou made after May 2001. . . . [F]or no discernible business purpose, significant amounts of money were transferred into and out of many different accounts with great frequency. The sheer volume of the transactions alone raises serious questions concerning the legitimacy of the account activity.

Compl. ¶¶ 73-74.

The Complaint states five counts. Count I alleges that the Bank aided and abetted Kyprianou's breach of fiduciary duty by "knowingly permitting Kyprianou to launder tens of millions of U.S. dollars that represented the proceeds of his insider trading activities." Compl. ¶ 98. Count II alleges that the Bank, of which AremisSoft was a depositor, is liable as a constructive trustee of AremisSoft's assets and of all the accounts in which Kyprianou had a direct or indirect interest. *Id.* ¶¶ 102, 104, 108. Count III alleges that the Bank breached its contract with AremisSoft through its failure to alert AremisSoft to Kyprianou's money laundering. *Id.* ¶ 112. Count IV alleges that the Bank breached an implied covenant of good faith and fair dealing through its improper administration of the accounts. *Id.* ¶ 116. Count V is a claim for negligence stemming from the Bank's alleged failure to exercise ordinary care in the handling of its accounts. *Id.* ¶¶ 120, 121.

**D.    The Context of This Lawsuit**

Plaintiffs have already instituted legal actions in Cyprus. In July 2005, they sued twelve primary players, including Kyprianou, in the underlying fraud perpetrated on the Company. *See* Decl. Demetrios Stylianides, in Supp. Def.'s Mot. Dismiss ("Stylianides Decl."), dated Nov. 22, 2006, ¶ 13. Nine of the defendants are alleged either to reside in Cyprus or to have operations there. In January 2006, plaintiffs obtained freezing orders against defendants which relate to a property under the alleged control of defendants, located in London. *See id.* ¶ 17.

8

In another action, filed in December 2005, plaintiffs sought discovery against the Bank of Cyprus and three other banks. *Id.* ¶ 18. This discovery was to be in aid of the main Cyprus action. That application was opposed by the Bank on the basis that it did not assert any substantive claim and also failed to name as necessary parties to the action AremisSoft, Kyprianou, and other persons and entities. Def.'s Mem., at 5; Decl. John Fellas, in Supp. Def.'s Mot. Dismiss, dated Nov. 30, 2006 ("Fellas Decl."), Exs. 4,6, 7. On Aug. 31, 2006, the Cyprus court denied plaintiffs' application, a decision which plaintiffs have appealed. The next day plaintiffs filed this action in New York against the Bank. Def.'s Mem., at 5.

## E.    Judge Pisano's Decision

Before the present motion to dismiss was filed in this Court, District Judge Pisano dismissed a similar case brought by the same plaintiffs in the District of New Jersey against two private Swiss banks. *See LaSala & Zeidman v. Bordier et Cie & Dominick*, 452 F. Supp. 2d 575 (D. N.J. 2006). The complaint in that case, like the complaint at bar, alleged a tort cause of action, though plaintiffs had also asserted claims arising out of alleged violations of Swiss statutory provisions. Judge Pisano dismissed all plaintiffs' claims on the ground that the entire action was preempted by SLUSA. *Id.* at 579-91.

In that case, defendants had filed a separate motion to dismiss on the basis of *forum non conveniens* and lack of personal jurisdiction, but "contend[ed] that dismissal under SLUSA . . . is a subject matter jurisdiction inquiry pursuant to Rules 12(b)(1) and 12(h)(3)." 452 F. Supp. 2d at 577 n.1. While Judge Pisano noted that the case had been brought on the basis of diversity jurisdiction, he said, "The Court need not resolve whether this motion is properly brought pursuant to Rule 12(b)(1) and/or Rule 12(h)(3)," because the parties agreed that SLUSA would be addressed

9

before other pending motions and the outcome of his SLUSA analysis rendered the other pending motions moot. *Id.*

SLUSA preemption is certainly a question of subject matter jurisdiction when the case comes to federal court via removal from a state court. *See Spielman v. Merrill Lynch et al.*, 332 F.3d 116, 122-25 (2d Cir. 2003); *Aruaujo v. John Hancock Life Ins. Co.*, 206 F. Supp. 2d 377, 380 (E.D.N.Y. 2002). For claims that fall within SLUSA, the statute preempts actions removed from state courts "by essentially converting a state law claim into a federal claim," *Spielman*, 332 F.3d at 123, and then mandating its dismissal. As Judge Lynch of this Court has pointed out, however, the statute contains separate provisions concerning "preemption as a     jurisdictional mechanism requiring removal" and "preemption as a defense to state-law claims." *Winne v. Equitable Life Assurance Soc. of U.S*, 315 F. Supp. 2d 404, 409 (S.D.N.Y. 2003). Preemption therefore appears in SLUSA in the form of *both* a jurisdictional provision *and* a failure to state a claim provision. Normally, as Judge Newman pointed out in a concurring opinion in *Spielman,* the two are "the opposite sides of the same coin." *Spielman*, 332 F.3d at 132. *See also Winne*, 315 F. Supp. 2d at 409. The case at bar was not *removed* from a state court to this Court. Plaintiffs *initially* filed their complaint in this Court on the basis of diversity of citizenship. In consequence, SLUSA is a preemption *defense* and, as such, one of a number of preliminary grounds for dismissal, among which a judge has discretion to choose when deciding whether to dismiss a case. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1186 (2007) (a federal court "has leeway to choose among threshold grounds for denying audience to a case on the merits") (citation and internal quotation marks omitted). In the exercise of that discretion, I consider first the *forum non conveniens* ground for dismissal.

10

## II.  DISCUSSION

### A.  *Forum Non Conveniens*

The doctrine of *forum non conveniens* permits a court to dismiss an action "even if the court is a permissible venue with proper jurisdiction over the claim." *Carey v. Bayerische Hypo-Und Verinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) (citation omitted).  A district court should dismiss a complaint where, on balance, the resolution of the matter in an adequate alternative forum would be more convenient for the parties and courts and more just.  *See R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991) ("The central purpose of a forum non conveniens inquiry is to determine where trial will be most convenient and will serve the ends of justice.").  "The first step in a *forum non conveniens* analysis is for the court to establish the existence of an adequate alternative forum.  Second, the court must determine the level of deference to accord the plaintiff's choice of forum.  Third, the court must weigh the public and private interests in order to determine which forum will be most convenient and will best serve the ends of justice." *USHA (India), Ltd. v. Honeywell Int'l, Inc.* , 421 F.3d 129, 134 (2d Cir. 2005)  (citations, internal quotation marks, and ellipses omitted).

A decision to dismiss "lies wholly within the broad discretion of the district court and may be overturned only when we believe that discretion has been *clearly abused.*" *Honeywell International*, 421 F.3d at 134 (emphasis in original) (internal quotation marks omitted). "In the last analysis, it always must be borne in mind that there is no algorithm that assigns precise weights to the factors that inform *forum non conveniens* determinations.  The doctrine instead is intensely practical and fact-bound.  The most that may be said is that courts reach informed judgments after considering all of the pertinent circumstances." *First Union Nat'l Bank v. Paribas*, 135 F. Supp. 2d

443, 448 (S.D.N.Y. 2001), *aff'd sub nom.*, *First Union Nat'l Bank v. Arab African Int'l Bank*, 48

Fed. Appx. 801 (2d Cir. 2002) (unpublished opinion).

## 1.    Adequacy of the Alternative Forum

An alternative forum is adequate "if the defendants are amenable to service of process there,

and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd. v. Chase

Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003). This does not mean that the same degree of relief

must be available in the alternative forum. *See Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 453 (2d Cir.

1975) (district court "has discretion to dismiss an action under the doctrine of forum non conveniens,

. . . even though the law applicable in the alternative forum may be less favorable to the plaintiff's

chance of recovery"). "Absent . . . a fundamental obstacle to a plaintiff's recovery . . . American

courts are not prone to characterizing a sovereign nation's courts as 'clearly unsatisfactory.'

International comity plays a part in this context as well." *Sussman v. Bank of Israel*, 801 F. Supp.

1068, 1076 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993).

Defendant submits the declaration of a Cyprus legal expert giving this view:

The subject matter of the Amended Complaint can be litigated before the Courts of
Cyprus, in the sense that the relief sought in the said Amended Complaint can be
pursued before the Courts of Cyprus, on the basis of the same general allegations of
purported wrongdoing. Cyprus recognizes claims for breach of contract and for
various torts, including negligence, and constructive trust. Cyprus courts have the
authority to award monetary damages as well as injunctive and other relief.

Stylianides Decl. ¶ 37.  Mr. Stylianides also stated that Cyprus law does not recognize a claim for

aiding and abetting a breach of fiduciary duty. *Id.* ¶¶ 38-40. Similarly, while Cyprus law recognizes

claims for breach of contract, Stylianides concluded that it does not recognize a claim for an implied

duty of good faith and fair dealing, such as is brought by plaintiffs. *Id.* ¶¶ 45, 46. Thus Cyprus

12

would not permit two of plaintiffs' five causes of action. This characterization of the law of Cyprus is not disputed.

That Cyprus law does not recognize two of the five causes of action does not prevent the Cyprus forum from being adequate. Consistent with the cases just cited, the Second Circuit has made it abundantly clear that "[t]he availability of an adequate alternate forum does not depend on the existence of the identical cause of action in the other forum," *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998). *Cf. Zweig v. Nat'l Mortgage Bank of Greece*, No. 91 Civ. 5482, 1993 WL 227663, at *9 (S.D.N.Y. June 21, 1993) (plaintiffs' contention that only one legal remedy remains in Greece due to tolling of Greek statute of limitations is incorrect and thus plaintiffs have "a number of options that remain viable" and there is no "fundamental obstacle" to plaintiffs' recovery). Plaintiffs contended at oral argument that Cyprus's failure to recognize two of their causes of action does render it inadequate, and in support of this contention they cited *Greenlight Capital, Inc. v. Greenlight (Switzerland) S.A.*, No. 04 Civ. 3136, 2005 WL 13682 (S.D.N.Y. Jan. 3, 2005). *See* Tr. of Oral Argument on April 5, 2007 ("Oral Arg. Tr."), at 41-42 ("Judge Baer found that because a trademark claim could not be asserted in the proposed alternative forum in Switzerland, it was not an adequate forum and that is the type of rare circumstance which requires the denial of a motion for forum non. That's what you have here because there is no alternative in Cyprus to the aiding and abetting and [sic] breach of fiduciary duty claim.").

The comparison to *Greenlight Capital* is not apposite because that case implicated United States trademark law, which is considered a territorial law not well suited for foreign adjudication. *See Greenlight Capital*, 2005 WL 13682, at *5 ("[T]here is no evidence that Greenlight Capital will be able to fully litigate its U.S. trademark rights in Switzerland because '[t]rademark rights are

13

largely territorial, as they exist in each country solely according to that country's statutory scheme.'") (citation and internal quotation marks omitted). Courts in this district have declined to dismiss cases pursuant to *forum non conveniens* where a plaintiff has asserted U.S. trademark or copyright claims. *Id.* Here, plaintiffs are not suing under U.S. statutory law but rather under tort and contract law, both of which are common law remedies recognized in Cyprus, albeit with some differences. Where Cyprus law recognizes causes of action for three of the five claims brought by plaintiffs, it cannot be said that Cyprus fails to permit "litigation of the subject matter of the dispute." Consequently, the courts of Cyprus constitute an adequate alternative forum.

### 2.    Deference Due to Plaintiffs' Choice of Forum

The adequacy of the alternative forum having been determined, the next question is the amount of deference to be given plaintiffs' choice of forum. In cases with foreign defendants, the home forum for the plaintiff is any federal district in the United States, not the particular district in which the plaintiff lives. *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000); *Jacobs v. Felix Bloch Erben Verlag fur Bhune Film und Funk KG*, 160 F. Supp. 2d 722, 743 (S.D.N.Y. 2001). Thus in this case I must consider the deference that should be given plaintiffs' choice to sue in the United States (not New York specifically) as opposed to Cyprus.

In the Second Circuit, the "degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc). Considerations include "the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice," which includes "convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district." *Id.* at 72. Plaintiffs argue that they fall at a very high point on this

sliding scale. They maintain that they have a significant connection to the United States, as this is where AremisSoft was incorporated, where the Trust was established, and where the beneficiaries of the of the Trust are located. *See* Pl.'s Mem. in Opp'n, at 15. I agree that plaintiffs have significant ties to the United States and legitimate reasons for preferring to prosecute this action in the United States, such as convenience and expense and their interest in having an American judge decide issues that they maintain arise under American law. I also agree that it is not forum-shopping for plaintiffs to file this action here, after filing suit against Kyprianou in Cyprus, as they were obliged to sue him there after unsuccessful attempts to bring him to trial here. *See* Pl.'s Mem. at 19-20. The separate Cyprus action does not diminish the deference due to plaintiffs' choice of Cyprus as the forum for the action against the Bank.

However, in the Second Circuit, that deference *is* diminished when "plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts." *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir. 2000). *See Morrison Law Firm v. Clarion Co., Ltd.*, 158 F.R.D. 285, 287 (S.D.N.Y. 1994) ("The private interest of plaintiffs in suing in its [sic] home location is diluted because it chose to do business with Japanese firms and to seek their custom, making it logical that they be required to litigate there, a result which should not expose plaintiff to surprise."); *CCS Int'l, Ltd. v. ECI Telesystems, Ltd.*, No. 97 Civ. 4646, 1998 WL 512951, at *7 (S.D.N.Y. Aug. 18, 1998) (while "it remains defendants' burden to overcome the forum choice made by these American-citizen plaintiffs," for plaintiffs "who are involved in a decidedly international dispute such as this, their American citizenship and residence do not constitute the powerful, near-decisive factors for which they contend") (citation and internal quotation marks omitted). A plaintiff's choice of forum is also "given reduced emphasis where . . . the operative facts upon which the litigation is

15

brought bear little material connection to the chosen forum." *Nieves v. Am. Airlines*, 700 F. Supp. 769, 772 (S.D.N.Y. 1988). *See also Zweig*, 1993 WL 227663, at *4 (notwithstanding plaintiff's American citizenship and residency, dismissal in favor of Greece is warranted because operative facts on which the litigation was based bore little connection to New York).

Plaintiffs are not a corporation doing business abroad, but they are suing on behalf of a Trust whose governing document specifically authorizes litigation abroad. Plaintiffs have already litigated in several foreign countries. *See* Fellas Decl., Ex. 8, pp. 9-13 (describing plaintiffs' litigation abroad). Plaintiffs therefore more closely resemble a corporation with substantial resources than ordinary citizens of comparatively modest means. *See Carey*, 370 F.3d at 238 (in the case of an "individual of modest means," this "individual's choice of the home forum may receive greater deference than the similar choice made by a large organization which can easily handle the difficulties of engaging in litigation abroad"). Moreover, the operative facts of this litigation unquestionably took place in Cyprus. *See infra* Part II.A.3.b. I therefore conclude that while plaintiffs' choice of forum is entitled to some deference, it does not operate at full strength.

Additionally, I note that "[a] citizen's forum choice should not be given dispositive weight. ... [D]ismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 n.23 (1981) (citations omitted). *See also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 102 (2d Cir. 2000) (There is no "rigid rule of decision protecting U.S. citizen or resident plaintiffs from dismissal for *forum non conveniens*"; rather, a court "must take into account the hardship dismissal would cause to a resident plaintiff"); *Paribas*, 135 F. Supp. 2d

at 447 ("[T]he weaker the connection between a plaintiff's U.S. activities, even those of a U.S. plaintiff, and the events at issue in the lawsuit, the more likely it is that defendants attacking the plaintiff's choice of a U.S. forum will be able to marshal a successful challenge to that choice.").

Courts in this Circuit have numerous times dismissed suits by an American citizen or entity in favor of a foreign jurisdiction. *See, e.g.*, *Alcoa Steamship Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147 (2d Cir. 1978) (en banc) (in suit by American corporation, Trinidad held to be more appropriate forum); *Farmanfarmaian v. Gulf Oil Corp.*, 588 F.2d 880 (2d Cir. 1978) (dismissing suit by Iranian national on the basis of *forum non conveniens* despite treaty that mandated court access equivalent to American citizen); *Telephone Sys. Int'l, Inc. v. Network Telecom PLC*, 303 F. Supp. 2d 377, 384-85 (S.D.N.Y. 2003) (dismissing in favor of United Kingdom despite presumption in favor of American corporation's choice of United States forum because "[t]hat presumption in favor of a plaintiff's convenience is not absolute and may be outweighed"); *Realuyo v. Villa Abrille*, No. 01 Civ. 10158, 2003 WL 21537754, at \*4 (S.D.N.Y. Jul. 8, 2003) (finding, in concluding that the Philippines would be more appropriate jurisdiction, that "[a]lthough [American plaintiff's] forum choice warrants great deference, it is in this case outweighed by every other consideration"); *Paribas*, 135 F. Supp. 2d at 447; *Panama Processes S.A. v. Cities Serv. Co.*, 500 F. Supp. 787, 792 (S.D.N.Y. 1980) (American citizenship has "no particular effect" where other factors favor dismissal), *aff'd*, 650 F.2d 208 (2d Cir. 1981).

In this case, because plaintiffs are not an entity that stands to experience hardship of the kind that would be suffered by an individual plaintiff of modest means, I conclude that the deference due to plaintiffs is not so significant as to outweigh other factors if they weigh in favor of defendant.

**3.     Private and Public Interests**

17

In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), the Supreme Court set forth private and public interest factors which the district court should consider in determining which forum is most convenient and will best serve the ends of justice. These include "the ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508. Public interest factors include administrative difficulties stemming from court congestion, the interest in having "localized controversies decided at home," and the interest in having issues of foreign law decided by a foreign tribunal. *Id.* at 508-09.

### a. Private Interest Factors

Where alleged misconduct is centered in the foreign forum and the majority of evidence resides there, dismissal is favored. *See Strategic Value Master Fund v. Cargill Fin. Servs. Corp.*, 421 F. Supp. 2d 741, 766 (S.D.N.Y. 2006) (granting motion to dismiss in favor of England). *See also Acosta v. J.P. Morgan Chase*, 06 Civ. 995, 2007 WL 689529, at *2 (2d Cir. Mar. 6, 2007) (nothing unreasonable in district court's conclusion that inconvenience of transporting witnesses and translating documents from Spanish to English favors dismissal) (unpublished opinion); *Carey*, 370 F.3d at 238-39 (district court's decision to dismiss in favor of Germany was proper due to difficulty otherwise to be incurred by German defendant in securing presence of its witnesses in the United States and due to reasonableness of requiring plaintiff to litigate business transaction dispute in the country where it occurred); *Zweig*, 1993 WL 227663, at *7 (Greece more appropriate forum where "majority of the witnesses and documentary evidence" is located there).

18

Here, the vast majority of the evidence appears to be in Cyprus, where the bank accounts were opened and administered. *See* Pochanis Decl. ¶¶ 6-8. The Amended Complaint identifies several witnesses in Cyprus with knowledge of the events, but none in New York. *See* Def.'s Mot. at 7 n.26 (listing the Cyprus-based witnesses cited in the complaint). Conversely, defendant identifies at least 25 potential witnesses in Cyprus, including four current employees, five former employees who participated in administering the accounts at issue, and other non-party witnesses. *See* Pochanis Decl. ¶¶ 8, 11, Exs. A & B. Joseph LaSala, one of the plaintiff Trustees, offers as important U.S.-based witnesses Poyiadjis, Robert Peak (the principal SEC accountant involved in the AremisSoft investigation), former officers and directors of AremisSoft, and himself. *See* Decl. Joseph P. LaSala, in Opp'n Mot. Dismiss, dated Jan. 22, 2007 ("LaSala Decl."), ¶¶ 23-31. Plaintiffs also suggest that correspondent bank employees here in the United States could be witnesses. *See* Pl.'s Mem. in Opp'n, at 22-23; LaSala Decl., ¶¶ 19-21. Defendant counters that Peak was not so much as mentioned in the complaint and has no first-hand knowledge of the Bank's actions; defendant also points out that Poyiadjis is a minor figure in the complaint, as his name was never mentioned in the 64-paragraph recitation of allegations against the Bank. *See* Def.'s Reply Mem., at 6. As the quotation in Part I.C., *supra*, from ¶¶ 73-74 of the complaint makes clear, it was Kyprianou, and not his partner in crime Poyiadjis, who engaged in the transactions with the Bank of Cyprus which form the gravamen of plaintiffs' claims against the Bank.

While the witnesses mentioned by plaintiffs undoubtedly would have something to say about the overall scheme perpetrated by Poyiadjis and Kyprianou, I fail to see how they will assist a fact-finder in determining what Bank of Cyprus employees knew and did surrounding the particular accounts at issue in this case. As Judge Weinfeld noted in a situation where an alleged fraudulent

19

scheme occurred in Switzerland but the defendant contended that New York witnesses were important, "The New York witnesses can testify only as to how undisputed trades were executed. These matters, if pertinent at all, are not even of secondary significance; they are subordinate to the basic issue central to plaintiff's claims. . . . [The alleged fraudulent scheme] occurred in Geneva at Banque and Advicorp. Those who performed the fraudulent acts and issued directions in furtherance thereof did so there." *Fustok v. Banque Populaire Swisse*, 546 F. Supp. 506, 511 (S.D.N.Y. 1982). I am not persuaded that evidence from these U.S. sources would be more relevant than evidence originating from the locale of the complained-of conduct. That the overwhelming majority of witnesses resides in Cyprus therefore weighs significantly in favor of Cyprus.

Plaintiffs argue that defendant can cause its employees to appear in the United States to testify and that to the extent that non-party witnesses reside abroad, the Hague Convention on Taking Evidence Abroad is an adequate means to compel documents and witness testimony. *See* Pl.'s Mem. in Opp'n, at 23-24. However, this private interest factor is about convenience to the parties; thus the presence of the vast majority of witnesses in one forum weighs in favor of that forum, even if the witnesses could be transported. *See Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London et al.*, 940 F. Supp. 528, 538 (S.D.N.Y. 1996), *aff'd* 147 F.3d 118 (2d Cir. 1998) (where nearly all witnesses reside overseas, "transporting witnesses from England to the United States – even if they were within this Court's subpoena power or would appear voluntarily – would be extremely inconvenient and would impose a prohibitive cost on defendants"); *Scottish Air Int'l Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232-33 (2d Cir. 1996) (affirming district court's dismissal on *forum non conveniens ground* and noting that since vast majority of potential witnesses were residents of Great Britain, "the difficulty, cost, and disruption of requiring the

20

attendance of such witnesses in New York – whether they were willing to appear or not – would be considerable" and this weighed in favor of dismissal). Second, evidence obtained by means of the Hague Convention, which delivers testimony in the form of a judge's summary of a deposition,[3] is a poor substitute for live trial testimony. *See Scottish Air*, 81 F.3d at 1233 (noting that in prior case, the Second Circuit established that "the live testimony of key witnesses was necessary where the plaintiffs alleged that the defendants had conspired to defraud them. We deemed such testimony necessary for the jury to assess the witnesses' credibility."); *Allstate Life Ins. Co v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) (affirming *forum non conveniens* dismissal of securities fraud action in favor of Australia where plaintiffs alleged fraud and noting that "live testimony of key witnesses is necessary" in such cases); *Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978) (for important non-party Swiss witnesses, obtaining testimony by means of letters rogatory would be "very serious handicap" favoring dismissal on the ground of *forum non conveniens*); *Paribas*, 135 F. Supp. 2d at 450 (there exists a "strong preference for live trial testimony").

Documentary evidence also appears to be based predominantly in Cyprus. This includes documents in the possession of the Bank which relate to the accounts in question, such as documents concerning the opening of the accounts (including documents stating the corporate structure of any corporate account-holder and specimen signatures), account statements for each account, transfer instructions, and documents pertaining to the loan identified in the complaint. *See* Pochanis Decl. ¶¶ 6-7. Plaintiffs state that "critical and relevant documents are located in the United States," Pl.'s

---

[3] Counsel for defendant said at oral argument, "If you take a deposition or if you seek to take evidence from a witness in Cyprus, you do not get a transcript. What you do is you get a summary prepared by a judge. I've had this experience in other countries." Oral Arg. Tr., at 25 (statement by Mr. Fellas).

21

Mem. in Opp'n, at 24, but they fail to identify which, apart from documents concerning the transactions at correspondent banks. Their assertion that the Bank of Cyprus has since August 2005 provided documents to the Trust's counsel in the United States, *see* Pl.'s Mem. in Opp'n, at 25, is not relevant to the test itself, which looks to *where* the documents are actually located. Whether transporting them is a "relatively undemanding task," *see id.*, only speaks to the weight that I should give to this factor in the private interests calculus. I conclude that the location of documents is a factor weighing in favor of defendant, though in today's world where electronic storage of documents is the norm, not a factor of enormous weight. *See Europe & Overseas Commodity Traders,* 940 F. Supp. at 537-38 ("[I]n light of technological advances in transportation and communication, this Court recognizes that the location of documents is a factor which is to be given less weight now. . . .").

Another consideration pertaining to the witnesses and documents is translation. The parties dispute the extent to which documents will be in English or Greek. *Compare* Pl.'s Mem. in Opp'n, at 25 (documents likely to be in English and/or will consist mostly of numbers and banking data), *with* Pochanis Decl. ¶ 7 (some Bank documents are in Greek). Defendant also states that Greek is the mother tongue of the persons it lists as potential witnesses for the Bank (as well as for non-party witnesses), and that these witnesses would testify in Greek through an interpreter, *see* Pochanis Decl. ¶¶ 9, 12. I do not undertake to resolve the dispute between the parties concerning the language of the documents. However, I credit defendant's representation that Bank witnesses would testify through an interpreter. Plaintiffs argue that "[it] is unreasonable for Defendant to assert that the *de minimus* [sic] costs of translation are evidence of inconvenience to the multi-national banking institution that is the Bank of Cyprus." Pl.'s Mem. in Opp'n, at 24. Even putting aside the question

22

of cost, the difficulties presented to a court's assessment of witness credibility are considerable. *See Fustok*, 546 F. Supp. at 510 ("In addition to the expense and inconvenience of travel for these [foreign] witnesses, if that were contemplated, many of them do not speak English as a primary language which would present an added obstacle to a smooth flowing trial in this District."). *See also Zweig*, 1993 WL 227663, at *8 (amount of translation of documents and testimony that would be required if litigation remained in New York far outweighs amount if action were litigated in Greece).

Based on the location of documents and relevant witnesses, I conclude that the private interest factors favor defendant.

### b. *Public Interest Factors*

Public interest factors include judicial economy, the interest in having "localized controversies decided at home," and the interest in having issues of foreign law decided by a foreign tribunal. *Gilbert*, 330 U.S. at 508-09. This Court has explained, "[T]here is little sense to allowing a U.S. citizen to haul a group of foreign defendants into a U.S. court on transactions having little or nothing to do with this country where there is an available foreign forum significantly better suited to handling the litigation in a prompt, efficient and effective manner." *Paribas*, 135 F. Supp. 2d at 448 (dismissing fraud claims against French bank in favor of London, where fraudulent activity was centered). *See also Zweig*, 1993 WL 227663, at *4 (dismissing claims of New York plaintiff against Greek bank, even though plaintiff alleged he was defrauded in New York, because actions by Greek bank took place in Greece).

I turn first to the public interest in having localized controversies decided at home. This factor requires an evaluation of which forum possesses a stronger local interest in the controversy.

23

*See Pollux Holding*, 329 F.3d at 76 (not disagreeing with district court's determination that London has a "stronger local interest" in the controversy because, *inter alia*, the derivative instrument at issue was purchased there, the alleged fraud and misrepresentations primarily occurred there, and the alleged breach of contract and breach of fiduciary duty arose out of contracts entered into there). Plaintiffs point to the interest of the United States in safeguarding transactions involving U.S. currency and in "assuring that foreign banks are not havens for criminals who steal and launder U.S. currency." Pl.'s Mem. in Opp'n, at 26. *See also* LaSala Decl. ¶ 22 ("I respectfully submit that the United States has a greater interest in this litigation than Cyprus or any other forum because of the interest of the United States in protecting its currency transactions and policing the activities of foreign banks which use the U.S. correspondent banking system."). Plaintiffs also point to the interest of the United States in adjudicating matters affecting its residents. *See* Pl.'s Mem. in Opp'n, at 25. Finally, plaintiffs cite as a United States interest the fact that their claims arise under U.S. law. *See id.* at 26.

Defendant, by contrast, maintains that Cyprus possesses a strong interest in regulating the conduct of its banks. It contends that this interest is especially powerful here where the Bank of Cyprus is "the leading financial services organization in Cyprus, operating 146 branches there and having a market share close to 30% of total banking system deposits and loans in Cyprus." Def.'s Mem., at 18 (citing Pochanis Decl. ¶ 4). Defendant also stresses Cyprus's interest in applying its own law, which defendant argues applies in this case. *Id.* at 19. Defendant points out that since the government of Cyprus is already prosecuting Kyprianou's alleged co-conspirators in the Cypriot criminal court, and the Cyprus courts have already been presented with issues underlying the case, these factors, too, cause the public interest to weigh in Cyprus's favor. *See id.* at 19-20. Finally,

defendant notes that since the litigation against the Bank has already attracted media attention, there is an added interest in allowing the Bank to vindicate its reputation in local courts. *See* Def.'s Mem., at 18-20 (citing *Mobil Sales & Supply Corp. v. Rep. of Lithuania*, No. 97 Civ. 4045, 1998 WL 196194, at \*9 (S.D.N.Y. Apr. 23, 1998) (dismissing fraud action on *forum non conveniens* and citing interest of the Lithuanian defendants in "vindicating themselves before their community" and the Lithuanian community in "discovering whether its fellow citizens are in fact cheats or deadbeats").

I am persuaded that Cyprus possesses by far the strongest interest in this case. There is no question that this dispute centers around events occurring there. The Bank of Cyprus accounts were opened in Cyprus, and the transfers alleged to have been improperly permitted by the Bank were authorized by personnel in Cyprus. This is at its heart a dispute involving what Cyprus banking representatives did and what they knew when they did these things. The knowledge plaintiffs allege on the part of the Bank concerning the Bank's legal obligations and concerning the fraudulent nature of Kyprianou's transfers resides in the minds of Bank representatives in Cyprus. If, to quote *Gilbert*, it is preferable that "localized controversies" be "decided at home," Cyprus is home for the controversies generated by the plaintiffs' complaint.

Plaintiffs' argument that the transmission of dollar transfers through banks in the United States creates a strong public interest has been rejected by courts in this Circuit. *See, e.g., Lan Assocs. XVIII v. Bank of Nova Scotia*, No 96 Civ. 1022, 1997 WL 458753, at \*6 (S.D.N.Y. Aug. 11, 1997) (alleged wire transfer of funds in New York is insufficient to create public interest link to New York) ("Were such minimal contact with New York to be deemed significant, this Court, located in one of the world's largest and busiest financial centers, would be burdened with countless international financial disputes having no real, substantive link to New York."); *see also Calgarth*

*Invs. Ltd v. Bank Saderat Iran*, No 95 Civ. 5332, 1996 WL 204470, at \*6 (S.D.N.Y. Apr. 26, 1996) ("[D]ebits and credits at New York bank accounts, without more, do not give New York or the United States an interest in transactions that otherwise are entirely foreign."), *aff'd*, 108 F.3d 329 (2d Cir. 1997) (mem.); *Sussman*, 801 F. Supp. at 1074 (bank's "use of its New York Branch . . . to route the loan proceeds . . . cannot be regarded, in the overall scheme of things, as other than peripheral," and this is true "even if this routing of the funds was for the purpose of evading Israeli law"). The United States may have an interest in ensuring that American currency not be laundered and American investors not be defrauded by those who attempt to use foreign banks to further a criminal scheme. However, this interest pales in comparison with that of Cyprus. Cyrus possesses a strong interest in regulating the conduct of banks within its borders, especially where a particular bank plays such a large role in the country's economy. *See Zweig*, 1993 WL 227663, at \*10 (despite the fact that plaintiff was allegedly defrauded in New York and made visit to branch of Greek bank in New York, quoting *Sussman* for the proposition that "Greece's public interest in the issues raised by these charges dwarfs the public interest of New York, which is minimal"). In this case, there is even less connection between the underlying events and the United States than in *Zweig*. As in *Piper Aircraft*, "[T]he American interest in this accident is simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here." *Piper Aircraft*, 454 U.S. at 261.

As for plaintiffs' argument that adjudicating the interests of its residents is a United States interest, I agree that this interest exists, but it stands in equipoise to Cyprus's interest in adjudicating matters affecting its residents.

26

I also agree with plaintiffs that the law to be applied augments the interest of the forum possessing the applicable law,[4] but I disagree with plaintiffs's position that the law of a state of the United States applies. Courts often do not decide choice of law issues when performing a *forum non conveniens* analysis, *see Piper Aircraft*, 454 U.S. at 251 (judges considering *forum non conveniens* motions need not conduct an elaborate choice-of-law analysis because the doctrine "is designed in part to help courts avoid conducting complex exercises in comparative law"), but sometimes they do undertake the analysis, *see Zweig*, 1993 WL 227663, at *9 (need to engage in choice of law analysis, in which Greek law is found to apply, "plays an important role" in decision to dismiss under *forum non conveniens*). The mere likelihood of the application of foreign law weighs in favor of dismissal. *See Pollux Holding*, 329 F.3d at 76 (affirming as proper exercise of discretion judge's determination that application of English law favored adjudication in England); *Calavo Growers v. Generali Belgium*, 632 F.2d 963, 967 (2d Cir. 1980) ("[T]he likelihood that Belgian law would govern in turn lends weight to the conclusion that the suit should be prosecuted in that jurisdiction."); *Paribas*, 135 F. Supp. 2d at 453 (likelihood that court would have to apply English law to part or entirety of case "cuts to some degree in defendants' favor").

Since a federal court sitting in diversity applies the choice of law rules of the forum state, *see Klaxon v. Stentor Elec. Mfg.*, 313 U.S. 487, 496-97 (1947), which in this case is New York, if New York choice of law rules dictate that this case arises under Cyprus law, that outcome weighs in favor of dismissal.

---

[4] This implicates both the local interests possessed by the competing jurisdictions and the *Gilbert* Court's assessment that it is more appropriate to try a diversity case "in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Gilbert*, 330 U.S. at 509.

Plaintiffs allege both tort and contract causes of action.[5] In tort cases, New York courts apply the law of the jurisdiction with the "greatest interest" in regulating behavior within its borders or in having its law applied. *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1031 (2d Cir. 1996) (citing cases). This is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Fin. One Public Co. Ltd v. Lehman Bro. Spec. Fin., Inc.*, 414 F.3d 325, 337 (2d Cir. 2005) (citation omitted). "The contacts of the parties and occurrences with each jurisdiction are thus factors to be considered in applying interest analysis, together with the policies underlying each jurisdiction's rules, the strength of the governmental interests embodied in these policies, and the extent to which these interests are implicated by the contacts." *Id.*

Plaintiffs suggest that the jurisdiction with the greatest interest in the litigation is the locus of injury, which here is the United States. *See* Pl.'s Mem. in Opp'n, at 29.[6] In applying interest analysis, New York courts have said that "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its

---

[5] Count II of the complaint for constructive trust is, according to plaintiffs, "a form of equitable relief which may arise on the basis of tort or breach of contract, and over which the Court has broad discretion," but which plaintiffs maintain arises in this instance under tort law. *See* Pl.'s Mem. in Opp'n, at 28-29. Assuming for present purposes plaintiffs' characterization of the claim, I apply choice of law principles governing tort claims to it.

[6] The "place of the wrong" was the jurisdiction applied in tort cases under the old New York choice of law rules, but it was replaced with the more flexible "interest analysis." *See Brinks*, 93 F.3d at 1030 (in discussing New York's shift to the interest analysis approach, "New York courts, recognizing that a State may lack sufficient nexus with a case so that choice of its law is arbitrary or fundamentally unfair, abandoned these rigid rules in favor of a more flexible approach") (internal quotation marks and citation omitted).

borders." *Cooney v. Osgood Machinery*, 81 N.Y.2d 66, 72 (N.Y. 1993). The locus of the tort is where the "last event necessary to make the actor liable occurred. " *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 58 (E.D.N.Y. 2000) (citation omitted). However, this "last place"criterion "is not chiseled in stone, but rather gives way when it is at war with state interests so that the more general *Babcock* principle applies." *Id.* (referring to the landmark interest analysis case *Babcock v. Jackson*, 191 N.E.2d 279 (N.Y. 1963)). In other words, this "last place" criterion does not displace ordinary interest analysis. *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (refusing to apply the last event necessary test where a single state was overwhelmingly the center of gravity of the events at issue and that state's interest in regulating the conduct of work performed there was strong); *HSA Residential Mortgage Servs. of Texas v. Casuccio*, 350 F. Supp. 2d 352, 365 (E.D.N.Y. 2003) (refusing to apply "last place" criterion in case where plaintiffs alleged that defendant accounting firms prepared and approved fraudulent financial statements and instead applying law of New York which "has a strong interest in defining the scope of liability for accountants who work in its state" and "has the more significant interest in having its conduct-regulating law govern in order to regulate behavior within its borders"). Even the Second Circuit's recent application of the test did not rely on it exclusively in conducting interest analysis. *See White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006) ("[H]ere, where *not only* the vast majority of the conduct supporting the claim occurred in New York, *but also* the damages were suffered at WPL's New York headquarters, New York has the most significant interest and its laws apply.") (emphases added).

In this case, the "last place" or locus of the "last event necessary" is the United States, where the harm allegedly caused by the Bank was felt. A situation such as this, where the alleged

29

misconduct occurred in one jurisdiction, but because of the international nature of a company's business dealings the harm caused by that misconduct was felt in another country, presents precisely the sort of circumstance where a blind adherence to the rule that the last place determines the locus of the tort and therefore the jurisdiction with the greatest interest would result in the jurisdiction which does not possess the greatest interest being deemed so for choice of law purposes. In *Sussman* I held that even where the injury was felt in the United States, "Whether or not defendants' conduct was tortious will be measured by the law of Israel. It is that law upon which the parties, plaintiffs and defendants alike, relied in respect of defendants' conduct; and the interest of Israel in applying its law to admonish or prevent similar conduct in the future assumes a critical, and in my opinion, controlling importance in choice of law analysis." *Sussman*, 801 F. Supp. at 1075 (citing cases to support proposition that "this Court has regarded the place where the victim of fraud or negligence suffered economic loss as less significant for choice of law purposes than the law of the place by which the defendant's conduct is evaluated"). *See also Pollux Holding*, 329 F.3d at 76 (approving district court's assessment that "[g]iven that most of the relevant conduct occurred in England, English law would apply to the preponderance of plaintiffs' tort claims"); *Brinks*, 93 F.3d at 1032 (where injury of theft was felt in the United States, South Africa has greater interest than New York in the alleged wilful misconduct or gross negligence of South African Airways, a government instrumentality, and the South African police).

In this case, as discussed *supra*, the contacts between Cyprus and the underlying events are strong, while the contacts with the United States are minimal. *See Finance One*, 414 F.3d at 337 (contacts between Thailand and events are strong but between New York and events are weak where negotiations and other activities surrounding transactions at issue took place in Thailand, Hong

30

Kong, or Tokyo). I conclude that the strength of Cyprus's interest in the litigation outweighs that

of the United States. Cyprus's interest in regulating the conduct of banks within its borders,

particularly where the bank is the leading financial services provider in the country, is great. The

reputability of the country's banking system is intimately connected to the effectiveness of the

country's regulation of its banks, and it has a stronger interest in policing its financial systems than

does the United States in ensuring that United States dollars are not laundered abroad to the

detriment of United States shareholders and a United States company. Because the operative events

took place almost exclusively in Cyprus, the contacts with Cyprus directly implicate these significant

governmental interests. I therefore conclude that Cyprus law applies to plaintiffs' tort claims.[7]

---

[7] As noted in text, Count I of the complaint charges the Bank with aiding and abetting
Kyprianou's breach of fiduciary duty. Several courts in this district have applied to aiding and
abetting claims a doctrine known as the "internal affairs doctrine," which calls for the law of the
state of incorporation to be applied to issues relating to the internal affairs of a corporation. *See
Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 04 Civ.A. 2476, 2006 WL 278138, at *12
(S.D.N.Y. Feb. 2, 2006 (Batts, J.); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v.
Investicorp S.A.*, 80 F. Supp. 2d 129, 134 (S.D.N.Y. 1998) (Cedarbaum, J.); *BBS Norwalk One,
Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999) (Cedarbaum, J.); *Lou v.
Belzberg*, 728 F. Supp. 1010, 1023 (S.D.N.Y. 1990) (Sweet, J.). This doctrine might seem to call
for U.S. state law to be applied as AremisSoft was incorporated here. However, both Judges
Cedarbaum and Sweet recognized that the "internal affairs doctrine" merely amounts to an
assessment "that the state of incorporation has an interest superior to that of other states in
regulating the directors' conduct of the internal affairs of its own corporations." *Raccolta*, 60 F.
Supp. 2d at 129. In *Raccolta*, Judge Cedarbaum determined that the state of incorporation *was*
the jurisdiction with the greatest interest for the aiding and abetting claim. Applying these same
principles, Judge Mukasey found that a claim for aiding and abetting a breach of fiduciary duty
should simply be analyzed under normal "interest analysis." *See Solow v. Stone*, 994 F. Supp.
173, 177 (S.D.N.Y. 1998), *aff'd*, 163 F.3d 151 (2d Cir. 1998) ("[T]here is no jurisdiction with an
interest greater than New York's with respect to these [aiding and abetting] tort claims."). He
concluded that while the jurisdiction of incorporation is usually appropriate for claims against
directors for breaching a fiduciary duty, it is not appropriate for aiding and abetting claims. *Id.
See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 306 n.16 (S.D.N.Y.
1998) (agreeing with *Solow v. Stone* court that aiding and abetting breach of fiduciary claim is
governed by law of place where the acts giving rise to the claim took place). Thus, normal
interest analysis is appropriate even for plaintiffs' aiding and abetting claim. *See also In re*

31

In contract cases, New York choice of law "evaluates the 'center of gravity' or 'grouping of contacts,' with the purpose of establishing which state has 'the most significant relationship to the transaction and the parties.'" *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001) (citing *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc*., 84 N.Y.2d 309, 317 (N.Y. 1994)). This typically points to the place of contracting, the places of negotiation and performance, the location of the subject matter of the contract, and the domicile or place of business of the contracting parties. *Id.* Here, the contract at issue was the Bank of Cyprus's contract with AremisSoft, its depositor.

Because the accounts were opened in Cyprus, and the Bank was performing its contractual obligations there, the center of gravity is clearly Cyprus. Plaintiffs themselves cite a decision of this Court for the proposition that "[i]n some contract cases, New York choice of law principles require an interest analysis that looks to the law of the jurisdiction having the greatest interest in the litigation." *See* Pl.'s Mem., at 35 (citing *RLS Assoc. v. United Bank of Kuwait*, No. 01 Civ. 1290, 2006 WL 3421744, at *5 (S.D.N.Y. Nov. 27, 2006)). If I look to the law of the jurisdiction having the greatest interest in the litigation for the contract claims, I also arrive at Cyprus by means of the analysis given above for the tort claims. Thus Cyprus law applies to plaintiffs' claims arising under contract law as well.

In addition to choice of law considerations, two final public interest concerns are implicated by the presence of proceedings in Cyprus and the Bank's intention to file an indemnity action in Cyprus if it were to lose in this action here. *See* Def.'s Reply Mem., at 7. Three lawsuits, two of

_____

*Adelphia Commc'n Corp*., No. 02-41729, 2007 WL 1673928, at *8 (Bkrtcy. S.D.N.Y. June 11, 2007) (analyzing two lines of cases, one applying the "internal affairs" doctrine and the other applying normal interest analysis, and concluding that "the Court believes it should follow the latter line of authority.").

32

which would be in Cyprus and one here, may conceivably occur. *See* Oral Arg. Tr. at 21 (in the words of counsel for the defendant, plaintiffs argue that "[i]f you lose in New York, you can bring a separate claim in Cyprus, a separate indemnity claim in Cyprus. What they envisage is three lawsuits, your Honor. One against the primary perpetrators, Kyprianou and his cohorts, in Cyprus. One against the bank here in New York involving overlapping allegations in similar claims. Then a third lawsuit. If the bank were to lose here, a third lawsuit back in Cyprus by the bank against Mr. Kyprianou"). As a number of the issues in these actions are and would be overlapping (claims for aiding and abetting Kyprianou's crimes plainly involve issues related to those crimes themselves), the risk of inconsistent judgments arises. It also would be an inefficient use of judicial resources. *See Piper Aircraft*, 454 U.S. at 259 (possibility of indemnity or contribution action in Scotland weighed in favor of dismissal on *forum non conveniens* ground because "[i]t would be far more convenient . . . to resolve all claims in one trial"). The values of judicial economy and integrity in the administration of justice therefore militate against plaintiffs' desire to keep the case in this district. I conclude that the public interest strongly favors Cyprus.

Because the private interest factors also favor Cyprus, and it is an adequate alternative forum, I hold that the measure of deference due to plaintiffs' choice of forum is outweighed, and dismissal on the ground of *forum non conveniens* is warranted.

## B.     SLUSA Preemption

Although the complaint will be dismissed on the basis of *forum non conveniens*, I will discuss the other grounds for dismissal urged by the Bank in this motion, so that the Court of Appeals will be aware of this Court's opinion on all issues if it decides to reverse the *forum non conveniens* dismissal. I begin with SLUSA preemption.

33

In 1995 Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which imposed constraints on federal securities class actions due to "perceived abuses of the class-action vehicle in litigation involving nationally traded securities." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 126 S. Ct. 1503, 1510 (2006) (*"Dabit II"*), *rev'g Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25 (2d Cir. 2005) (*"Dabit I"*). Litigants, however, began to avoid application of the PSLRA by bringing class actions based on state law in state court, and Congress enacted SLUSA to prevent such circumvention. *See Dabit II*, 126 S. Ct. at 1510-12. To dismiss an action under SLUSA, the defendant must show: (1) the action is a "covered class action" under SLUSA; (2) the action is based on state law; and (3) the action is one in which the party alleges "an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security" or alleges that "the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C.A. § 77p(b). *See Webster v. N.Y. Life Ins. & Annuity Corp.*, 386 F. Supp. 2d 438, 440 (S.D.N.Y. 2006). For the following reasons, I hold that even though plaintiffs' claims would constitute a covered class class action arising under state law, they would not fall within the substantive scope of SLUSA's preemption.

## 1. Covered Class Action

A "covered class action," as defined by SLUSA, includes a lawsuit in which "damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class . . . predominate over any questions affecting only individual persons or members." 15 U.S.C. § 77p(f)(2)(A). The statute also states that "[f]or purposes of this paragraph, a corporation, investment company, pension plan, partnership, or

other entity, shall be treated as one person or prospective class member, but only if the entity is not established for the purpose of participating in the action." 15 U.S.C. § 77p(f)(2)(C) (emphasis added). Thus, if damages are sought on behalf of an entity (perhaps in addition to other persons), and the entity itself benefits multiple persons, that entity will nonetheless be treated as one person if it was not established for the purpose of participating in the action. In other words, the beneficiaries of damages that would accrue to an entity will only be counted towards the 50-person limit under circumstances where the entity was established to participate in the action.

In the case at bar, an action is brought by the Trustees on behalf a Trust that was assigned both the claims of former shareholders and the claims of AremisSoft itself. These threshold questions arise: (1) whether the Trust is seeking damages "on behalf of" more than 50 persons; and (2) if it is, whether the Trust falls within the entity exception, thereby avoiding a class action designation for what would otherwise be the claims of more than 50 persons. Defendant maintains that the Trust was formed for the purpose of participating in the action, as is evidenced by the Trust Agreement and by an order issued by Judge Pisano concerning the creation of the Trust, and therefore is not to be counted as a single entity. *See* Def.'s Mem., at 22. Plaintiffs counter that the Trust was formed for multiple purposes associated with its origin in a bankruptcy proceeding, only one of which is litigating Trust claims, and that therefore it does not constitute a covered class action. *See* Pl.'s Mem. in Opp'n, at 13-14. Plaintiffs also contend that since they are only bringing the claims of the Company, *see id.* at 11 ("In this action, the AremisSoft Trust asserts the claims of AremisSoft itself and not of the purchasers of securities who were defrauded."), the class action definition does not apply. *See id.* at 12.

35

Do these plaintiffs seek damages "on behalf of more than 50 persons," as that phrase is used in SLUSA? Because plaintiffs assert that they are bringing claims only on behalf of the Company, and a district court in Massachusetts distinguished corporate claims brought by a bankruptcy trust from the shareholder claims brought by the trust, *see Cape Ann Investors LLC v. Lepone*, 296 F. Supp. 2d 4, 12-13 (D. Mass. 2003), I first assess the significance of bringing "company claims" to the application of SLUSA's definition of a "covered class action." This is a straightforward analysis. The statutory definition speaks not in terms of the types of claims asserted but only whether damages are asserted "on behalf of" more than 50 persons. Here, plaintiffs' complaint states that

> any and all claims of AremisSoft's former shareholders arising out of the purchase of AremisSoft securities on the open market or otherwise from April 22, 1999 through and including July 27, 2001, and any and all of the claims of the Company itself which arose pre-bankruptcy, were assigned to, and for the benefit of, the AremisSoft Trust. The AremisSoft Trust acts as the representative of the Company and its shareholders who are beneficiaries of the AremisSoft Trust ("Trust Beneficiaries").

Compl. ¶ 6. *See also* Trust Agreement, Ex. 14 to Fellas Decl, Art. III, §§ 3.3(a)-(b) (stating that Trust recoveries are to be distributed as follows: first the Trustee is to be paid; second, any debts must be satisfied; third, the reorganized debtor Softbrands, Inc. receives its share; and fourth, "Class Members" receive the remainder). Since damages are being sought on behalf of these Trust beneficiaries, and since plaintiffs indicate that the former shareholders number more than 6000 persons, the Trust is clearly seeking damages "on behalf of" more than 50 persons. That SoftBrands is among these beneficiaries does not change the fact that the number is over 50. Additionally, SLUSA's provision exempting from the class action definition an "exclusively derivative action brought by one or more shareholders on behalf of a corporation," 15 U.S.C. § 78bb(f)(5)(C), also does not apply because this is not a derivative action brought "on behalf" of a corporation. While

36

the Trust possesses claims that formerly belonged to the Company, it brings these corporate claims on behalf of the Trust as a whole.

In *Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005), the Ninth Circuit analyzed a bankruptcy trust in a similar manner. The court referred to the defendants' position "that the Trustee's Action is brought 'on behalf of more than 50 persons or prospective class members,' i.e., the beneficiaries of the plan trust. . . ." *Id.* at 1007. While the court went on to disagree with the defendants' position with regard to the entity exception and found that the trust in that case did count as a single entity, it did not disagree with this approach of looking to the trust beneficiaries to determine whether the action was brought on behalf of more than 50 persons. Presumably the court would not have reached the question whether the entity exception applied if it had not found that the trust beneficiaries numbered more than 50. In *Bordier*, similarly, Judge Pisano noted that the beneficiaries of the Trust (which is the same Trust as in the case at bar) numbered more than 50 persons. *See Bordier*, 452 F. Supp. 2d at 590. The district court in *Cape Ann* came to a different conclusion with regard to the company claims asserted in that action, finding that they were not preempted because their "fundamental character" was corporate. *Cape Ann*, 296 F. Supp. 2d at 12-13. I respectfully disagree with this analysis, however; while the court was correct that a corporate claim is distinct from a shareholder claim, SLUSA's definition of a covered class action does not concern itself with the nature of the claim being advanced but rather with the nature of the persons or entities on whose behalf damages are sought. The character of the claim itself might well enter into the analysis at another stage, such as whether a defense of *in pari delicto* applies,[8] but it is not

---

[8] For my analysis of this defense, *see* Part II.C., *infra*.

relevant at this stage.  Here, since damages are indisputably being sought on behalf of beneficiaries of the Trust numbering more than 50 persons, the Trust is a covered class action unless the entity exception applies.

Next I turn to whether the entity exception applies.  In support of their argument that such claims do not constitute a covered class action, plaintiffs point to legislative history of SLUSA indicating that the term "covered class action" "does not cover instances in which a person or entity is duly authorized by law . . . to seek damages on behalf of another person or entity.  Thus, a trust in bankruptcy, a guardian, a receiver, and other persons or entities duly authorized by law . . . to seek damages on behalf of another person or entity would not be covered this [sic] provision."  Senate Report 105-182, at p. 8 (May 4, 1998) (quoted in Pl.'s Mem. in Opp'n, at 13).  This gloss does not resolve the question for the claims of *this* Trust, which is something more than an ordinary bankruptcy trust and is, as we have seen, not seeking damages only on behalf of "another person or entity."

In the case before him, Judge Pisano determined that the exception did not apply to the AremisSoft Corporation Liquidating Trust because the Trust was formed for the "primary purpose" of engaging in litigation, which he found satisfied the statutory language "for the purpose of participating in the action."[9]  *See Bordier*, 452 F. Supp. 2d at 582-84.  I agree with Judge Pisano, who it should be noted presided over the initial class actions against AremisSoft and the genesis of

---

[9]  It is clear that the trust need not be created for the purpose of participating in the *particular* legal action to count as a covered class action – the trust need only be created for the purpose of participating in litigation.  *See Cape Ann*, 296 F. Supp. 2d 4, 10 (D. Mass. 2003) ("The Trustee's argument that the Trust is a unitary entity because it was created not to pursue any particular action, but all 'such actions as necessary to recover on behalf of beneficiaries,' makes no sense conceptually or legally.").

this Trust in the Company's bankruptcy. Various provisions in the Trust Agreement indicate that while the Trust was empowered to accomplish multiple tasks, the chief among these was litigating the Trust claims. *See* Trust Agreement, at 1 ("The Trust is organized for the primary purpose of Liquidating the Trust Assets. . . ."); Trust Agreement, at 3 ("WHEREAS, on July 1, 2002, the United States District Court for the District of New Jersey ordered the confirmation of the Plan, providing, among other things, for the establishment of a trust which will hold and prosecute the AremisSoft Causes of Action and the Class Claims. . . ."); Trust Agreement, Art. I, § 1.3 "Purpose of Trust" ("The Trust is organized for the primary purpose of litigating the Trust Claims, distributing the proceeds of the Trust Claims and the Proceed Assets to the Class Members and liquidating its assets for the benefit of the Class Members. . . ."). Because I conclude that the Trust was formed for the primary purpose of engaging in litigation, the entity exception does not apply.

Plaintiffs seek support for their position in *Smith*, where the court held that a bankruptcy estate was not a covered class action. However, in that case, the governing document setting forth the scope of the trustee's powers stated that it would "act as the Estates' representative for *all purposes*," which included managing assets and winding up the estates. *Smith*, 421 F.3d at 1008 (emphasis in original). In other words, the prevalence of ordinary bankruptcy-related tasks in the mandate of the trust precluded a finding that it was organized for the primary purpose of litigating trust claims. This is not inconsistent with my holding here, because the governing document of that trust was different. The mandate of the Trust in the case at bar more closely resembles that in *Cape Ann*, where the "Nutramax Litigation Trust," to which were assigned both the claims of an investors' syndicate and the claims of the failed company NutraMax, was created by the bankruptcy court during the company's Chapter 11 bankruptcy proceeding as a vehicle for pursuing any potentially

39

recoverable assets. *See Cape Ann*, 296 F. Supp. 2d at 8.  The district court found that the trust agreement, whose primary purpose was described as "prosecuting the Causes of Action contributed to it . . . and distributing to the Class 6 Beneficiaries [the Electing Shareholders] the assets of the Trust remaining after payment of all claims against or assumed by the Trust," indicated that the Trust was organized for the "primary purpose" of litigation. *See id.* at 10.  The court therefore declined to find that the Trust was a unitary entity under the statutory exception and held that it was a covered class action.  While this Court believes that the district court in *Cape Ann* should not have excluded the company claims from its analysis of trust claims, I am persuaded by the court's reasoning concerning SLUSA's entity exception.  The origin of that trust, and the language of its governing document, are similar to those in the case at bar, and thus the *Cape Ann* court's reasoning supports my interpretation of the statutory language.  The AremisSoft Corporation Liquidating Trust is not a single entity within the meaning of SLUSA.

For these reasons, plaintiffs' claims constitute a "covered class action."

### 2.    Based on "state law"

In Part II.A.3.b., *supra*, I concluded that, applying New York choice of law analysis, the law of Cyprus governs this action.  However, SLUSA requires only that the action "purport to be based on state law," *Webster*, 386 F. Supp. 2d at 440, and plaintiffs at bar allege that state law applies.  Thus the issue of what law actually applies (and whether Cyprus law counts as "state" law for SLUSA purposes) need not be reached for my consideration of SLUSA's applicability in this case, as this SLUSA requirement is otherwise satisfied.

### 3.    SLUSA's Substantive Reach

After showing that plaintiffs' is a "covered class action" based on "state law," defendant must still demonstrate that the substance of plaintiffs' claims falls within SLUSA's preemption. SLUSA only preempts actions in which a plaintiff alleges "an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security" or alleges "that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b). It is not disputed that this case concerns a "covered security." Only the first of the two substantive provisions is at issue.    Plaintiffs argue that their allegations do not fall within SLUSA's substantive reach because they never alleged that the *defendant Bank of Cyprus* ever made such statement or omission – rather, that misrepresentations were made by others. *See* Pl.'s Mem. in Opp'n, at 9-10. Defendant responds that all that is required is that the complaint contain allegations of misrepresentations concerning securities, even if they were not made by defendant. *See* Def.'s Mem., at 24-25. Since this particular complaint is rife with allegations of misrepresentations by Kyprianou and others, defendant's argument goes, SLUSA preempts it.

### *a.     SLUSA Analysis in this Circuit*

Plaintiffs are correct that the conduct of defendant is still central to SLUSA analysis and that the mere allegation of misrepresentations somewhere in the complaint is not sufficient for SLUSA preemption. The Supreme Court's pronouncements that SLUSA should be interpreted broadly, relied on by the Bank, do not dislodge the relevance of defendant's conduct to the analysis. In *Dabit II* the Court stated, "[T]he identity of the plaintiffs does not determine whether the complaint alleges fraud in connection with the purchase or sale of securities. The misconduct of which respondent complains here – fraudulent manipulation of stock prices – unquestionably qualifies as fraud 'in

41

connection with the purchase or sale' of securities. . . ." *Dabit II*, 126 S. Ct. at 1515. The Court never indicated that the statute is so broad as to cut off any claim where the plaintiff happens to reference a misrepresentation in the complaint – regardless of whether it was central to the "misconduct of which respondent complains" on the part of the defendant in the action. In other words, while plaintiff's identity is not a critical component of SLUSA analysis, defendant's conduct is. *See also Paru v. Mut. of Am. Life Ins. Co.*, No. 04 Civ. 6907, 2006 WL 1292828 (S.D.N.Y. May 11, 2006) (claim of breach of fiduciary duty due to company's failure to prevent short-term trading in and out of mutual fund that allegedly harmed fund's long-term investors not preempted by SLUSA because it did not involve allegations of misstatements or omissions by defendant).

In this Circuit, in order for a claim to be preempted by SLUSA, the *claim* must sound in fraud. *See Xpedior Creditor Trust v. Credit Suisse First Boston (USA), Inc.*, 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004) (discussing this requirement and stating that "[a] claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim."). *See also Breakaway Solutions, Inc. v. Morgan Stanley & Co. Inc.*, No. Civ. A 19522, 2004 WL 1949300, at *8-*10 (Del. Ch. Ct. 2004) (breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, and indemnification claims not preempted by SLUSA where factual allegations concerning allocation of public offering shares did not sound in fraud). In *Xpedior*, Judge Scheindlin articulated a test that captures this requirement of a connection between the misrepresentations or omissions alleged in the complaint and the claim or claims being advanced. She observed, "Each of these courts applied what I will call the 'necessary component' test, wherein a court must determine whether the state law claim relies on misstatements or omissions as a 'necessary component' of the claim. In this context,

42

'necessary component' encompasses both technical elements of a claim as well as factual allegations intrinsic to the claim as alleged." *Xpedior*, 341 F. Supp. 2d at 266. This test is applied to the substance, rather than the face, of plaintiff's claim. *Id.* at 268 ("[T]he real question was whether the claim was based on fraudulent conduct, regardless of the appearance of the word 'fraud' or 'misrepresentation.'"). Under the necessary component test, "a complaint is preempted under SLUSA only when it asserts (1) an explicit claim of fraud (*e.g.*, common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-variety state law claims that 'sound in fraud.'" *Id.* at 266. Judge Scheindlin found that none of plaintiff's claims – breach of contract, breach of the implied covenants of good faith and fair dealing, breach of fiduciary duty, or unjust enrichment – required misrepresentations or omissions as a necessary element, none of them sounded in fraud, and thus none were preempted by SLUSA. *Id.* at 269; *cf. In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 443 (S.D.N.Y. 2001) (Marrero, J.) (plaintiff's claims for fraud, negligence, and negligent misrepresentation were "grounded on" alleged misstatements and therefore barred by SLUSA).

The test articulated in *Xpedior* is a sensible way of identifying the types of claims SLUSA was intended to preempt. If merely making allegations of fraud somewhere in the complaint were sufficient to bring the case within the reach of SLUSA, a class action complaint for commission of an environmental tort, that also alleged that the company fraudulently altered its books and thereby deceived shareholders, would be preempted, even if the claim against the defendant had nothing to do with securities fraud. Nevertheless, defendant is correct that the misrepresentation or omission at issue need not in all instances be *made by defendant* for SLUSA to preempt the claim. In the case of an aiding or abetting claim, where the underlying conduct that was aided or abetted sounds in

43

fraud, it might be sufficient for the misrepresentation or omission at issue to have been made by the person allegedly aided and abetted by defendant. This was also Judge Pisano's conclusion, when, after framing the question before him as "whether SLUSA preempts state law aiding and abetting claims, where a third party, as opposed to the defendant, purportedly made actionable misrepresentations or omissions," he answered it in the affirmative. *Bordier*, 452 F. Supp. 2d at 585.

In addition to requiring that the claim against defendant sound in fraud, SLUSA also requires that the misstatements or omissions alleged by plaintiffs be "in connection with the purchase or sale of securities." 15 U.S.C. § 77p(b)(1). With respect to the "in connection with" requirement, the Supreme Court stated in *Dabit II*, "[I]t is enough that the fraud 'coincide' with a securities transaction – whether by the plaintiff or by someone else. The requisite showing, in other words, is 'deception in connection with the purchase or sale of any security. . . .'" *Dabit II*, 126 S. Ct. at 1513 (quotation and citation omitted). *See Winne*, 315 F. Supp. 2d at 412 ("in connection with" requirement met because allegedly fraudulent fee charged by brokerage firm was intrinsic component of the security and affected its underlying value); *Korsinsky v. Salomon Smith Barney Inc.*, No. 01 Civ. 6085, 2002 WL 27775 (S.D.N.Y. Jan. 10, 2002) (positive recommendations on AT&T stock issued by research analysts at Salomon Smith Barney, made despite knowledge of AT&T's financial problems in order to boost Salomon's investment banking business, were "in connection with" purchase or sale of securities).

Where the alleged conduct giving rise to the claim is too far removed from a securities transaction, the "in connection with" requirement is not met. *See Norman v. Salomon Smith Barney, Inc.*, No. 04 Civ. 4391, 350 F. Supp. 2d 382 (S.D.N.Y. June 9, 2004) (failure by defendant brokerage firm to reveal conflict of interests tainting its research analysts' recommendations, where plaintiffs

44

never saw the analysts' reports with the alleged misrepresentations or relied on them in any way, was not claim falling within SLUSA's purview); *Spielman v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 01 Civ. 3013, 2001 WL 1182927 (S.D.N.Y. Oct. 9, 2001), *appeal dismissed*, 332 F.3d 116 (2d Cir. 2003) (while transaction fees charged by Merrill Lynch affected the cost of trading, they were "not sufficiently connected to the underlying securities to meet the requirement that the misrepresentation about those fees be 'in connection with' the purchase or sale of covered securities"); *Gavin v. AT&T Corp.*, 464 F.3d 634 (7th Cir. 2006) (Posner, J.) (where alleged misconduct was due to letter's failure to inform shareholders of complete array of options following company's merger, fraudulent conduct cited in complaint was unconnected to securities); *Strigliabotti v. Franklin Res., Inc.*, 398 F. Supp. 2d 1094, 1100 (N.D. Cal. 2005) ("The fraud in question must relate to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection to the securities themselves. While the fraud in question need not relate to the investment value of the securities themselves, it must have more than some tangential relation to the securities transaction."); *French v. First Union Sec*, Inc., 209 F. Supp. 2d 818, 824 (M.D. Tenn. 2002) (failure by broker to make statements regarding his qualifications or investment strategy not preempted by SLUSA) ("[I]n order for a breach to be 'in connection with' securities sales, the breach of the fiduciary duty must do more than simply implicate securities. Rather, there must be a showing of a nexus between the fraud and a securities transaction.").

These requirements that must be satisfied for SLUSA preemption to apply are, under the law of this Circuit, applied to each claim in the complaint rather than to the whole action. In *Bordier*, Judge Pisano disposed of the Swiss law claims in his SLUSA analysis by citing a Third Circuit case holding that SLUSA preempts entire actions and not claims. *See Bordier*, 452 F. Supp. 2d at 577

45

n.1 (citing *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 298 (3d Cir. 2005)).  That is not

the law of this Circuit.  In *Dabit I*, the Second Circuit dismissed one of the plaintiff's claims as

preempted by SLUSA but not the other.  The court noted that defendant's interpretation that

maintenance of an entire action is prohibited so long as a complaint included some allegations

triggering preemption would lead to the result that "SLUSA would effectively preempt any state law

claim conjoined in a given case with a securities fraud case, whatever its nature." *Dabit I*, 395 F.3d

at 47.  The court declined to adopt that reading because "the historic police powers of the states are

not preempted unless it was Congress's 'clear and manifest purpose' to do so."  *Id*.  When the

Supreme Court overruled *Dabit I*, it was on other grounds, and thus I take the Second Circuit's

claim/action analysis to be the law of the Circuit.[8]  The Supreme Court in *Dabit II* did not express

a view as to the Second Circuit's position on the action/claim analysis.[9]

---

[8] Additionally, the Second Circuit expressly decided the question in *Gray v. Seabord Sec., Inc.*, 126 Fed. Appx. 14, 16, at *1 (2d Cir. 2005) (rejecting argument that preemptive provision of SLUSA requires dismissal of entire action that includes one or more preempted claims).  While *Gray* is an unpublished summary order, and Local Rule § 0.23 prevented the parties from citing this case in their briefs, I agree with Judge Lynch in finding "the opinion of a distinguished Second Circuit panel highly persuasive, at least as worthy of citation as law review student notes, and eminently predictive of how the Court would in fact decide a future case such as this one." *Harris v. United Fed'n Teachers, New York City Local 2*, 02 Civ. 3257, 2002 WL 1880391, at *1 n.2 (S.D.N.Y. Aug. 14, 2002).  Local Rule § 0.23 has since been superseded by new Fed. R. App. P.32.1, which prohibits federal courts from disallowing the citation of unpublished opinions, but the new Rule 32.1 only applies to decisions issued "on or after" January 1, 2007.

[9] In *In Re Lord Abbett Mut. Funds Fee Litig.*, No. 04 Civ. 0559, 2006 WL 3483946 (D.N.J. Dec. 4, 2006), a district court in the District of New Jersey expressed its view that the Supreme Court "weakened, if not undercut entirely, the Second Circuit's reading in *Dabit I* that SLUSA only preempts claims and not entire actions," because the Supreme Court stated that the presumption against preemption of state law claims did not possess the same force in the SLUSA context. *Id*. at *6.  Since the Second Circuit had relied upon that presumption in its claim/action analysis, the court's reasoning ran, the Supreme Court effectively eviscerated the basis for the Second Circuit's separate consideration of claims.  I am not entirely in agreement.  The Supreme Court in *Dabit II* stated:

In a recent Supreme Court case, *Jones v. Block,* 127 S. Ct. 910 (2007), the Court held that the Prisoner Litigation Reform Act ("PLRA") preempts claims and not entire actions. The Court reasoned that the PLRA, which provides that "no action shall be brought" unless administrative procedures have been exhausted, only requires dismissal of claims that have not been properly exhausted – not dismissal of an entire action if a claim or claims within it have not been properly exhausted). While it could be argued that the PLRA is a different statutory scheme altogether and the Court's analysis of it may not be applied wholesale to SLUSA, the Court did outline several general principles that signal disapproval of dismissing entire actions as a general rule: "This statutory phrasing – 'no action shall be brought' – is boilerplate language. . . . More generally, statutory references to an 'action' have not typically been read to mean that every claim included in the action must meet the pertinent requirement before the 'action' may proceed." *Id.* at 924. Additionally the Court addressed principles for dismissal of the complaint: "As a general matter, if a complaint contains both good and bad claims . . . [o]nly the bad claims are dismissed; the complaint as a whole is not. If Congress meant to depart from this norm, we would expect some indication of that, and we find none" (quotation and citations omitted). *Id.* While this language

In concluding that SLUSA pre-empts state-law holder class-action *claims* of the kind alleged in Dabit's complaint, we do not lose sight of the general presum[ption] that Congress does not cavalierly pre-empt state-law *causes of action.* But that presumption carries less force here than in other contexts because SLUSA does not actually pre-empt any state *cause of action.* It simply denies plaintiffs the right to use the class action device to vindicate certain *claims.*

*Dabit II,* 126 S. Ct. at 1514 (emphases added). The Court's own explanation of SLUSA's operation describes the statute as preempting claims and not actions. While I read the Supreme Court's dicta in *Dabit II* differently than does Judge Martini, *Dabit II* falls short of a ruling by the Supreme Court that SLUSA preempts claims rather than actions or vice versa.

about "norms" for interpreting statutory language concerning dismissal of a complaint reinforces my interpretation of SLUSA, I still cannot say that such language itself definitively decides the claim/action question within the SLUSA context.

In the absence of clear indication from the Supreme Court, I am bound by existing Second Circuit law, until such time as the Second Circuit should change its mind or the Supreme Court decide the question squarely. Accordingly, I consider plaintiffs' claims separately. Only those that are supported by allegations that fall within the scope of SLUSA's preemption are preempted.

### *b.* *SLUSA's Requirements Applied to Plaintiffs' Claims*

Count I of the complaint is for "aiding and abetting a breach of Kyprianou's fiduciary duty." To analyze this claim, we need to examine the underlying conduct by Kyprianou that the Bank is alleged to have aided and abetted. According to the complaint, the Bank is alleged to have assisted Kyprianou in three principal areas. First is his looting of AremisSoft funds by transferring corporate cash to accounts he controlled at the Bank of Cyprus. *See* Oral Arg. Tr., at 35 (statement by Mr. Lefton) ("So, they [Kyprianou and his co-conspirators] took money from the United States which was generated by operating revenues in the United States in the entities that ultimately become Softbrands, by operating revenues generated in England where there were real operations, and by reason of the sale of stock on the U.S. markets, and by reason of the exercise of options that were granted by the U.S company. That cash goes to Mr. Kyprianou. He puts it in the Bank of Cyprus accounts of AremisSoft. He steals \$20 million, and puts it in his own pocket."). The Bank also allegedly assisted Kyprianou in using AremisSoft funds to buy several companies for much less than he had told the AremisSoft board they were worth, and then pocketing the difference between the actual amount paid for the companies and the amount of AremisSoft money authorized as payment

48

for them. And finally the Bank allegedly facilitated his money laundering of the proceeds of Kyprianou's illegal insider trading.

The Bank is alleged to have aided and abetted this activity by accepting these funds into accounts controlled by Kyprianou. The first of Kyprianou's activities in which the Bank is implicated is straightforward theft. The second and third certainly involved fraud on the part of Kyprianou in connection with a larger scheme of deception of the Company. Even if it could be said that the allegations against the Bank in this Count sound in fraud because Kyprianou's underlying conduct was fraudulent, the acts of Kyprianou in which the Bank is implicated did not "coincide" with a securities transaction. As Counsel for plaintiffs said at oral argument concerning the additional funds that were authorized by AremisSoft for the foreign acquisitions over and above what Kyprianou had actually paid for them:

> What happened to the rest of the money? Well, the AremisSoft board of directors causes their bank in New Jersey to transfer to AremisSoft accounts at the Bank of Cyprus in Cyprus. Mr. Kyprianou then through an Austrian company, which is a shell with no operations in Cyprus, except a bank account at the Bank of Cyprus, transfers the money from the AremisSoft Bank of Cyprus accounts to the Austrian shell company Bank of Cyprus accounts, and the very next day or the next day transfers that same now $10 million to himself at yet other accounts at the bank of Cyprus. That's not a securities fraud. That's a fraud on the company.

Oral Arg. Tr., at 36. I agree that this was a fraud perpetrated on the Company itself rather than securities fraud. If the value of the Company's outstanding shares rose as a result of these purchases, that would merely have been an incidental effect of the fraud; any connection to securities is simply too attenuated. Count I therefore does not fall within SLUSA's substantive reach.[10] *Cf. Gavin*, 464

---

[10] Nothing in my holding is intended to suggest that SLUSA could not preempt a claim for aiding and abetting a breach of fiduciary duty, so long as the defendant's conduct is alleged to be in

F.3d at 639 ("Of course there is a literal sense in which anything that happens that would not have happened but for some prior event is connected to that event. In that sense the fraud of which the plaintiff complains is connected to the merger, without which there would not have been such a fraud against the plaintiff and her class. But in the same sense the fraud is connected to the Big Bang, without which there would never have been a MediaOne or even an AT&T.").

Counts II-V of the complaint are claims for constructive trust, breach of contract, implied covenant of good faith and fair dealing, and negligence. For these claims, which are not aiding and abetting claims, the misrepresentations or omissions required by SLUSA must be made by defendant in order for the claim to be connected to conduct sounding in fraud. It is not, however, alleged that the Bank made any misrepresentations or omissions – rather that the Bank failed to exercise the diligence it was required to exercise given the duty of care it owed to AremisSoft and its contractual obligations to AremisSoft as a depositor of the Bank. *See, e.g.*, Compl. ¶ 103 (Bank "knowingly permitted AremisSoft assets to be converted and looted by Kyprianou into accounts he controlled and maintained at Bank of Cyprus."); *id.* ¶ ("Through the failure of authorized officials and/or employees of Bank of Cyprus to alert AremisSoft to either known facts or suspicions that its funds were being converted, laundered and mingled with funds belonging to Kyprianou, his family or the

---

furtherance of a securities fraud. *See In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 308 (S.D.N.Y. 2005) (count alleging breach of fiduciary duty and/or aiding and abetting breach of fiduciary duty preempted by SLUSA because "the Complaint's allegations demonstrate that these claims are based on fraudulent conduct"); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (dismissing count for aiding and abetting breach of fiduciary duty as preempted by SLUSA); *Prof'l Mgmt. Assocs., Inc. Employees' Profit Sharing Plan. v. KPMG, LLP*, 335 F.3d 800, 803 (8th Cir. 2003) (claims against accounting firm preempted by SLUSA where complaint alleged, *inter alia*, that the firm aided and abetted company's breaches of fiduciary duty).

various entities controlled by Kyprianou, Bank of Cyprus breached its contractual obligations to AremisSoft and caused substantial loss to the Company."); *id.* ¶ 116 (Bank "fail[ed] to alert AremisSoft to obvious and suspicious activities with respect to its accounts, and . . . allowe[ed] AremisSoft assets to be converted, laundered, and mingled with funds belonging to Kyprianou and others"). Because none of these claims sounds in fraud or contains fraudulent conduct as a necessary component of the claim, none of them falls within SLUSA's reach.

Accordingly, none of plaintiffs' claims is preempted by the statute.

## C.   The Doctrine of *In Pari Delicto* and the *Wagoner* Rule

Under my analysis, plaintiffs' claims, which are the claims of AremisSoft, survive SLUSA preemption. Whether the Trustees, who are empowered by the Trust Agreement to bring the company claims, *may* in fact bring them, or whether these claims are barred under another theory, is a separate question unrelated to SLUSA. The Bank of Cyprus asserts defenses based on the doctrine of *in pari delicto* and a doctrine known as the *Wagoner* rule, after *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991). *See* Def.'s Mem. at 26-27; 29 n.92.

Literally meaning "in equal fault," the common law defense of *in pari delicto* bars a plaintiff from recovering a loss caused in part by his own wrongful conduct.[11] *Ucar Int'l Inc. et al. v. Union Carbide Corp.*, No. 00 Civ. 1338, 2004 WL 137073, at *10 (S.D.N.Y. Jan 26, 2004). A plaintiff is prohibited from bringing a claim where it was an "active, voluntary participant in the unlawful activity that is the subject of the suit." *Granite Partners*, 17 F. Supp. 2d at 308 (quotation marks

---

[11] It is derived from the Latin maxim *in pari delicto potior est conditio defendentis*, meaning that "in the case of equal or mutual fault . . . the position of the [defending] party is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985).

omitted). The principles grounding the defense are twofold: (1) courts should not provide a forum to resolve disputes between wrongdoers; and (2) precluding relief to an admitted wrongdoer will have a deterrent effect on illegal conduct. *Id.* Defendant asserts that plaintiffs are barred from bringing their claims because AremisSoft was a wrongdoer, as is evidenced by the Company's admission of complicity in the fraud. *See* Def.'s Mem., at 26 (citing Trust Agreement at 1) ("Whereas, in materials filed with the United States Securities and Exchange Commission, AremisSoft Corporation has admitted (i) financial and accounting irregularities relating to revenue recognition. . . ."). Plaintiffs counter that the SEC Order referred to in the Trust Agreement contains an explicit provision stating that AremisSoft submitted the Offer of Settlement "[s]olely for the purpose of these proceedings, and any other proceedings brought by or on behalf of the commission or to which the Commission is a party, without admitting or denying the findings set forth below. . . ." *In re AremisSoft* (Jul. 31, 2002).[12] Plaintiffs also argue that even though Poyiadjis and Kyprianou were agents of AremisSoft, their wrongdoing should not be imputed to the Company because they were acting with interests entirely adverse to those of the Company. Plaintiffs rely on an exception known as the "adverse interest" exception, which applies when the agent has "totally abandoned his principal's interests and [is] acting entirely for his own or another's purposes." *In re CBI Holding Co., Inc.*, 311 B.R. 350, 369 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).

Under the *Wagoner* rule, "where a bankrupt corporation has joined with a third party in

---

[12] I take judicial notice of the Order, whose text is quoted in defendant's reply memorandum in the related case against *UBS*. *See* Def.'s Reply Mem., at 5, *LaSala et Zeidman v. UBS*, 06 Civ. 1736 (quoting *In re AremisSoft*, Admin. Proc. File No. 3-10854, SEC Release No. 46285, 78 S.E.C. Docket 346 (Jul. 31, 2002), *available at* http://sec.gov/litigation/admin/34-46285.htm).

defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Wagoner*, 944 F.2d at 118. This is because "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Id.* at 120. "The rationale for the *Wagoner* rule is the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation. Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (citations omitted). Like the *in pari delicto* doctrine, therefore, the *Wagoner* doctrine relies on principles of agency law in determining whether management's misconduct is to be imputed to the bankrupt corporation. *See In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 609 n.45 (S.D.N.Y. 2007) (the two doctrines are "quite similar," though the *Wagoner* doctrine is a standing rule, and *in pari delicto* is a defense). Thus under New York law, if the "adverse interest" exception to the normal rule of imputation applies (and no exception to that exception applies), the trustee, standing in the shoes of the bankrupt corporation, has standing to bring the claim against the third party.

The intricacies of New York (or, for that matter, Delaware) agency law are not, however, at issue in this case. Both *in pari delicto* and the *Wagoner* rule involve applications of substantive state law. *See Granite Partners,* 17 F. Supp. 2d at 306 n.16 (New York law determines applicability of *in pari delicto* defense because its substantive law applies to the claim); *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d at 594, 595 ("Whether a claim belongs to the debtor or to its creditors is a function of the substantive law governing each claim" and *Wagoner*'s doctrine concerning complicit third

parties is a question of New York law). *See also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 156 (2d Cir. 2003) (Texas law properly applied to determine whether plaintiff's claims belong to debtor or its creditors).

If the law of Cyprus applies, as I have found that it does, *see supra* Part II.A.3.b., these legal arguments may not be available to defendant.   Judge Kaplan came to a similar conclusion about the *Wagoner* doctrine in a case involving North Carolina law: "[T]here is a fundamental problem with the Bank's use of *Wagoner*.   The case, to whatever extent it may be relevant to the *in pari delicto* issue, is an application of New York law.   The question whether the Parmalat Debtors are chargeable with the fraud allegedly perpetrated by the companies' former management, and thus whether Bondi is subject to a defense of *in pari delicto*, is governed by the law of North Carolina.   *Wagoner* is simply not controlling here."   *In re Parmalat Sec. Litig.,* 383 F. Supp. 2d at 595.   Mr. Stylianides, defendant's expert, states that *in pari delicto* is a "related principle" to general principles of Cyprus law, whereby a court "will consider whether plaintiff can make out his case otherwise than through the medium and by the aid of the illegal transaction to which he was himself (factually or legally) a party.   If a plaintiff cannot do so then he will be denied a remedy."   Stylianides Decl. ¶ 49.   As I am not in possession of sufficient evidence concerning Cypriot law on this question (such as what principles Cyprus's agency law employs to determine whether the conduct of Poyiadjis and Kyprianou are to be imputed to AremisSoft), I decline to consider the applicability of these two doctrines.

**D.     12(b)(6) Failure to State a Claim**

I likewise do not reach defendant's third ground for dismissal in its motion, namely, failure to state a claim upon which relief may be granted.   Because I have found that the law of Cyprus

applies to plaintiffs' claims, and that the preference for a foreign court's deciding questions of foreign law is a factor in my dismissal on the basis of *forum non conveniens*, it would not be appropriate for the Court to conduct a Rule 12(b)(6) analysis on the basis of Cypriot law.

## III. CONCLUSION

For the foregoing reasons, and in the exercise of my discretion, I grant defendant's motion to dismiss on the ground of *forum non conveniens* only, and dismiss the complaint without prejudice to the merits of plaintiffs' claims.[13]

That dismissal is conditioned upon the defendant Bank of Cyprus appearing and defending on the merits, without interposing a statute of limitations, an action asserting claims arising out of these facts, by the plaintiff Trustees in the courts of Cyprus, failing which plaintiffs may apply to restore the case to this Court's calendar.

It is SO ORDERED.

Dated: New York, New York
August 15, 2007

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[13] Plaintiffs' pending motion for an order requiring defendant to retain and preserve documents, records, and data is also hereby denied as moot. Since this case has been dismissed in favor of the courts of Cyprus, any application for the preservation of documents or related relief should be made to the courts of that country.